IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

WARRIOR SPORTS, INC.,              *
successor by merger to BRINE CORP.,

                                     *      Civil Action No. 11-1860

          Plaintiff,

v.                                *

NEAL GOLDMAN,                *

          Defendant.           *

*    *    *    *    *    *    *    *    *    *    *    *

**FIRST AMENDED COMPLAINT**

Plaintiff, Warrior Sports, Inc., successor by merger to Brine Corp. ("Warrior") hereby

amends its complaint and sues defendant, Neal Goldman ("Goldman") as follows:

**Parties, Jurisdiction and Venue**

1.      Warrior is a Michigan corporation with its principal place of business located in

Warren, Michigan.  Warrior is recognized as one of the sporting goods industry's premier

manufacturers of innovative, high performance, cutting-edge equipment, footwear and apparel,

including in particular, for the sports of lacrosse and hockey.  In 2007, Warrior and Brine Corp.

were merged and Warrior became the successor in interest to Brine Corp.

2.      Neal Goldman is an individual, residing in Baltimore City, Maryland.   Neal

Goldman was the Captain of the 2004 Georgetown University lacrosse team, a four year starter

with the team and the 2004 Georgetown Male Athlete of the year.  After graduating from

Georgetown in 2004, Neal Goldman worked briefly with the Wrigley Company, and then

became Director of Sales of Inside Lacrosse Magazine.  To and including at least 2010, Neal

Goldman also played professional lacrosse with the Chesapeake (then, Washington) Bayhawks

as a midfielder and attackman.   In May, 2007, through its Brine Lacrosse Hard Goods

Equipment division, Warrior hired Neal Goldman as Product Manager.  Neal Goldman worked

for Brine, and for Warrior as its successor, for nearly three (3) years, from May, 2007 to April 2,

2010.  He had not before working with Warrior, sold or designed lacrosse equipment or apparel,

or participated in the development of lacrosse equipment.  In April, 2010, Neal Goldman began

work in Baltimore for Under Armour, Inc., a direct competitor of Warrior.

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that the parties are

citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of

interest and costs.

4.      Venue is proper in this Court because defendant Goldman is by information and

belief a Baltimore City resident.

## Common Allegations

6.      In May, 2007, Neal Goldman accepted an offer of employment with Warrior

(through its Brine Lacrosse Hard Goods Equipment division) as Product Manager.  This position

as Product Manager included calling on Warrior customers, and designing, selling and

promoting the sales of Warrior lacrosse equipment and lacrosse apparel.

7.       As a condition of his employment with Warrior, Neal Goldman on or about May

11, 2007 executed an Employee Proprietary Information Agreement ("Agreement").  The

Agreement detailed the material terms governing the employment relationship between Neal

Goldman and Warrior ("Agreement," Exhibit A hereto).

8.      The Agreement specifically defines the term "Principals" to mean Warrior, Inc.

Inc.  The Agreement further states in pertinent parts as follows:

> 5.      **Covenant Not To Solicit**.  I acknowledge that I owe a fiduciary duty to
> BRINE not to participate in any business which competes, directly or indirectly,
> with any business now or hereafter conducted by BRINE or the Principals (the
> "Business Activities").  Accordingly,

A.      In the event of my voluntary resignation or termination for cause, I will not, during and for the period commencing with the date hereof and ending on the date that is twelve (12) months after termination of my employment, directly or indirectly, engage in any Business Activities (other than as a holder of less than one [1%] of the outstanding capital stock of a publicly traded corporation), consultant, advisor, agent or otherwise, in any geographic area in which the products or services of BRINE or its Principals have been marketed, distributed, sold or provided,

B.      I will not, during and for the period commencing with the date hereof and ending, on the date that    is two (2) years after termination of my employment (regardless of whether that termination is voluntary, for cause, or without cause), directly or indirectly, engage in any Business Activities (other than on behalf of BRINE or its Principals) by contacting any customers or vendors of BRINE or its Principals, or by supplying products, offering to supply products, providing services, or offering to provide services heretofore supplied or provided to any customer with whom BRINE or its Principals has done any business, whether as an officer, director; proprietor, employee, partner, investor (other than as a holder of less than one [1 %] percent of the outstanding capital stock of a publicly traded corporation), consultant, advisor, agent or otherwise.

C.      I will not, during and for the period commencing with the date hereof and ending on the date that is two (2) years after termination of my employment (regardless of whether that termination is voluntary, for cause, or without cause), directly or indirectly, assist others in engaging in any of the Business Activities in the manner prohibited to me.

6.      **Modification**.  This Agreement may not be changed, modified, released, discharged, abandoned, or otherwise amended, in whole or in part, except by an instrument in writing, signed by BRINE.  I agree that any subsequent change or change in my duties, salary or compensation shall not affect the validity or scope of this Agreement.

7.      **Entire Agreement**.  I acknowledge receipt of this Agreement, and agree that with respect to the subject matter thereof it is my entire agreement with BRINE, superseding any previous oral or written communications, representations, understandings, or agreements with BRINE or any officer or representative thereof.

*   *   *

12.      **Third Party**.  It is expressly agreed that the Principals are intended third party beneficiaries of this Agreement and may directly enforce the terms and provisions hereof.

- 3 -

13.     **Attorneys Fees**. I agree that in the event that I am found to have violated any provision of this Agreement, I shall be responsible for the costs and attorneys fees incurred by BRINE (or any of its Principals) in connection with the enforcement of the terms and provisions hereof.

Neal Goldman signed the Agreement and dated his signature "5/11/07."

9.     As a part of the Agreement, as set out above, Neal Goldman promised that he would not for a period of two (2) years after the termination of his employment, regardless of the reason for termination, contact any customers or vendors of Warrior or its affiliates by supplying products or offering to supply products to any customer with whom Warrior or its affiliates has done any business, or has offered to do business, whether as an officer, director, proprietor, employee, consultant, advisor, agent or otherwise.

10.     Further, as set out above, pursuant to the terms of his Agreement, Neal Goldman was prohibited from assisting others in soliciting customers or vendors of Warrior in the manner prohibited to Neal Goldman. These vendors and customers included, during the period of Neal Goldman's employment with Warrior, and continue to include, Dick's Sporting Goods and The Sports Authority. Both are large, nationally-recognized retailers of sports equipment, including lacrosse equipment.

11.     As part of his employment duties with Warrior, Neal Goldman acquired certain knowledge about Warrior's customers, including, but not limited to, their needs, product requirements, and pricing, which knowledge, should he act in competition with Warrior, would place Warrior at a severe competitive disadvantage. In particular, during the time that he worked for Warrior, Neal Goldman called on and had extensive relationships with personnel from Dick's Sporting Goods and The Sports Authority. He also devoted much of his time with Warrior to the design and marketing of lacrosse equipment, including sticks and heads. Had he never been employed by Warrior, Neal Goldman would not have had the sales relationships with Dick's

Sporting Goods and The Sports Authority and specifically, their lacrosse equipment and lacrosse

apparel buyers, that he developed because of that employment.  Further, had he never been

employed by Warrior, Neal Goldman would not have had direct experience with the design and

manufacture of Warrior lacrosse equipment, including lacrosse sticks and heads.

12.     Warrior has fully performed under the Agreement.  Further, through his work

with Warrior, Neal Goldman built up good will with Warrior customers, including with Dick's

Sporting Goods and with The Sports Authority, in addition to the good will which Warrior

already had with those customers.

**Neal Goldman's Employment by Under Armour, a Warrior Competitor**

13.     In or about May 2010, Neal Goldman quit his job with Warrior and went to work

for Under Armour, a direct competitor of Warrior, taking a job with Under Armour as Product

Manager.  This raised concerns about whether Neal Goldman intended to honor his Agreement

with Warrior.

14.     Warrior, by its counsel, therefore sent Neal Goldman a letter dated June 24, 2010

reminding him of his contractual obligations to Warrior and insisting that he honor those

contractual obligations (06/24/10 Letter, Exhibit B).   Goldman contends that he never received

this letter.

15.     Thereafter, Warrior received certain assurances from Goldman that he was

working in apparel only, that he was not working in the lacrosse equipment division for Under

Armor, and that he fully intended to honor his contractual obligations to Warrior.  Nevertheless,

Warrior at no time ever permitted Neal Goldman to call on Warrior customers, including Dick's

Sporting Goods and The Sports Authority, for the sale of lacrosse apparel or promotion of any

other lacrosse-related item.  Based on these assurances that he was only selling apparel, Warrior

did not pursue the matter further with Neal Goldman at that time.

16.     In August, 2011, Neal Goldman became Senior Product Manager for Apparel with Warrior, even further increasing his responsibilities to promote Under Armour apparel, including lacrosse apparel, by information and belief, to Warrior customers.

### Under Armour's Attempts to Enter the Lacrosse Equipment Market

17.     At the same time that Neal Goldman began work with Under Armour in May, 2010, however, Under Armour was in the midst of a concerted effort to enter the lacrosse equipment market through its growing share of sales in the lacrosse apparel market, and to compete directly with Warrior not only in the lacrosse apparel market, but also in the closely-related lacrosse equipment market.  Consequently, the sale and promotion of Under Armour lacrosse apparel was, well before May 2010, and continues to be, in direct competition to sales of Warrior lacrosse products, including lacrosse equipment.  It has been and continues to be Under Armour's marketing strategy, as detailed more fully below, to enter the lacrosse equipment market, in direct competition to Warrior, by promotion of Under Armour lacrosse apparel, thereby encouraging sale of Under Armour lacrosse equipment.

18.     Under Armour's plan to enter the lacrosse equipment market, through its promotion of Under Armour apparel, began at least some time in the first half of 2009 and while Neal Goldman was still a Warrior employee.  By information and belief, Under Armour had, for about a year prior to May, 2010, collaborated with Paul Gait, an internationally-known figure in lacrosse and member of the United States Lacrosse National Hall of Fame and National Lacrosse League Hall of Fame, to design and develop for Under Armour, under license, lacrosse equipment such as gloves, sticks, heads, and related gear.  Paul Gait is a principal of another Warrior lacrosse equipment competitor, deBeer/Gait Lacrosse.  Because of his commitments to

deBeer/Gait Lacrosse, however, by information and belief, Paul Gait is restricted from making

sales presentations or promotions of or for lacrosse equipment and gear other than that of

deBeer/Gait Lacrosse.  Therefore, Under Armour must rely on others than Paul Gait, including,

by information and belief, Neal Goldman, to promote and sell lacrosse equipment, developed by

Paul Gait, in competition with Warrior.

o, including, by information and belief, Neal Goldman.

19.     Paul Gait assisted in the incorporation of a New York corporation, Vertical Lax,

Inc., which was registered on or about  July 29, 2009.   By information and belief, the sole or

main purpose of the incorporation of Vertical Lax, Inc. was to have Vertical Lax, Inc. enter a

partnership, joint venture and/or licensing agreement with Under Armour for the development of

lacrosse equipment to be sold in direct competition with Warrior.  Never, after its incorporation,

has Vertical Lax, Inc. manufactured lacrosse equipment, including for its own label or trade

name.

20.     On or about August 29, 2009, by information and belief, Paul Gait and/or

personnel employed by or contracted with Under Armour, registered the domain name

"ualax.net" with the intention of using this domain name for collaboration on the development of

lacrosse equipment.  By information and belief, the registration of the domain name "ualax.net"

was in further preparation for announcement of a Under Armour lacrosse equipment product

line. Under Armour, Inc. is the owner and registrant of the domain name, "ualax.com."  On or

about December 4, 2010, Paul Gait, for Vertical Lax, Inc., listing as his email address

"paul@ualax.net,"  filed with the U.S. Patent and Trademark Office an application for the

trademark, "Team 22 Lacrosse."  "Team 22 Lacrosse" is, by information and belief, a lacrosse

team for high school and college level players, outfitted exclusively with Under Armour apparel

and Under Armour lacrosse equipment, including, for the purpose of promoting such lacrosse

apparel and equipment in direct competition with Warrior.

21.    Under Armour had been rumored for months before May 25, 2011 to have plans

to enter the lacrosse equipment market.  On May 25, 2011 it finally announced this entry, along

with its collaboration with "Vertical Lax," with the following press release:

> Baltimore, MD (May 25, 2011) – Under Armour, Inc. (NYSE:UA), the
> Baltimore, MD-based leader in sports performance apparel, footwear, and
> accessories, announced today the debut of its lacrosse equipment collection which
> will hit retail November 2011. This marks the first time that Under Armour
> lacrosse hard goods – sticks, gloves, and pads – all built light and tough for
> unprecedented speed, mobility, and protection, will be available for purchase.
>
> **Under Armour has joined forces with Vertical Lax, Inc., a leading
> manufacturer of lacrosse hard goods to bring state-of-the-art technology to
> the lacrosse field**. The brand's equipment collection includes men's, women's,
> and youth heads, handles, and gloves, men's and boys' arm pads and shoulder
> pads, as well as women's and girls' goggles.
>
> "This launch will answer one of the most common requests we hear from athletes
> through our focus groups, our college and high school teams, or directly through
> our website," said Kip Fulks, Executive Vice President, Product, Under Armour.
> "As with all of our product launches, we took the time to do extensive research
> and development to ensure that we will deliver a distinct advantage in design and
> performance that was not offered previously in the market. The result is an elite
> hard goods collection that will further establish Under Armour as a category
> leader in innovation."
>
> The line of equipment and protective gear comes equipped with the most
> advanced features in the game. All protective products feature a new
> revolutionary "Molded Skin" technology for reduced weight and improved
> flexibility without sacrificing protection. **Consistent with Under Armour's
> origins, the protective equipment also features a HeatGear® liner that wicks
> moisture away from the skin**. All women's sticks are available with the "Player
> Flex Pocket," the most innovative pocket in the game, which breaks in easier than
> traditional pockets, maintains its integrity longer, and adapts to the ball to create a
> better hold.
>
> Under Armour will support the new lacrosse equipment collection through a
> multi-faceted digital, print, out-of-home, and grassroots marketing campaign.
> Additionally, Under Armour will have a major presence during collegiate

> lacrosse's biggest weekend of the year with a unique on-site fan activation experience. Fans will be able to receive a sneak peek and tryout the new hard goods line at Sharp and Ostend Streets, in Baltimore, MD. The brand experience will be open the following dates and times: Saturday, May 28 from 10AM – 4PM, Sunday, May 29 from 12PM – 4PM, and Monday, May 30 from 10AM – 3PM.
>
> Under Armour has been a strong supporter of lacrosse at the grassroots level as the originator of the All-America Lacrosse Classic, which debuted in 2006 to recognize the best high school lacrosse talent in the country. In 2007 the brand introduced lacrosse footwear for the first time. For more information on the lacrosse hard goods collection or additional Under Armour products, visit www.UnderArmour.com.

(Emphasis added).  Under Armour's marketing campaign beginning May, 2011 for its lacrosse equipment, featured the equipment prominently linked to Under Armour lacrosse apparel.  Neal Goldman at the time continued to promote Under Armour lacrosse apparel, and by through promotion because of its association with Under Armour lacrosse equipment, as a direct part of the Under Armour marketing plan for that equipment, promoted Under Armour lacrosse equipment as well, all in direct competition with Warrior.

        22.    The Baltimore Business Journal followed this press release, with a May 25, 2011 article:

> Under Armour Inc. is taking on the fast-growing sport of lacrosse with a new equipment line hitting retail stores in November.
>
> The Baltimore sportswear company is partnering with lacrosse manufacturer Vertical Lax Inc. on the products, including stick heads, handles, gloves, arm and shoulder pads and goggles.
>
> The line of lacrosse gear answers "one of the most common requests we hear from athletes through our focus groups, our college and high school teams, or directly through our website," Kip Fulks, Under Armour's executive vice president of product, said in a statement.
>
> Under Armour (NYSE: UA) said the equipment will feature a new "Molded Skin" technology aimed at reducing weight of the equipment and improving flexibility of lacrosse players.

The company will promote the equipment through digital, print and outdoor advertising.

Under Armour also plans on having a big presence outside M&T Bank Stadium this weekend during the NCAA Men's Lacrosse Final Four tournament. Fans will be able to test the new equipment lines at the display on Sharp and Ostend streets.

**The line marks Under Armour's entry into the lacrosse hard goods category. In 2007, the company began selling lacrosse cleats**.

A primarily youth-driven sport, lacrosse is a big opportunity for Under Armour to try and capture younger athletes.

(Emphasis added).

23.     After the May 25, 2011 announcement, Under Armour continued its lacrosse equipment promotion, led by its sales of lacrosse apparel, managed by Neal Goldman.  A July 8, 2011 Baltimore Business Journal story further explained Under Armour's strategy to enter the lacrosse equipment market through its lacrosse apparel marketing:

Under Armour wants to equip athletes, too

**.Sportswear maker pursues licensing deals to enter equipment industry**

Under Armour Inc.is beginning to make a push into the equipment business, **seeking to tighten its grip on certain sports where it already has a sizeable market share**.

The Baltimore sportswear maker views equipment — a potentially lucrative category outside of its core apparel and footwear lines — as an opportunity to put more of its products into the hands of athletes who wear the company's clothing during competition.
Under Armour recently debuted a $79.99 leather football, and this November a $59.99 basketball will hit shelves. At the same time, the company is rolling out its first line of lacrosse stick heads, handles, gloves, arm and shoulder pads and goggles.

Under Armour executives say they aren't rushing to roll out new equipment lines, rather opting to be patient for when the right opportunities arise. But it does represent a large opportunity.

Industry experts add that Under Armour is taking on less risk through its

equipment lines because the products are part of licensing deals with specialty manufacturers and not being made by the company itself.

Licensing revenue, the category where equipment falls for the company, represented just 4 percent of Under Armour's $1.06 billion in revenue last year. The company has been prepping for an expansion of equipment, with more than 30 people now working in its licensing and accessories department. That's up from three in 2008.

**"Equipment is certainly an opportunity for us," said Edward Giard, Under Armour's vice president of licensing and accessories. "It complements all the sports the brand is associated with."**

Under Armour, for example, has a 27 percent share of the retail lacrosse cleats business in the U.S., according to market research firm SportsOneSource. That's second only to footwear giant Nike.  **So the company has a valid reason to believe those lacrosse players sporting its shoes may be enticed to buy an Under Armour-branded stick or shoulder pad**.

Lacrosse, one of the country's fastest-growing sports and a major game from Baltimore to New York, is a hotly competitive sport when it comes to equipment, industry experts say. It won't be easy for Under Armour to grab market share, they say, but the company is entering at the right time considering the game's rapid growth.

"They're not going to switch at the drop of a hat," Bob Martino, a vice president at Cockeysville lacrosse retailer Lax said of the potential that athletes could switch to Under Armour equipment. "But lacrosse is exploding and it's still a relatively small sport."

Lacrosse equipment is a $75 million U.S. retail business, according to SportsOneSource. The sport is dominated by niche manufacturers like Brine, STX and Warrior.

Those niche players are a reason why Under Armour isn't tackling the equipment industry alone. For football and basketballs, the company is teaming with licensee PSI 91 Inc.

The balls, available in a variety of sizes for high school and college games, are made with proprietary leather from manufacturer Horween. In lacrosse, Under Armour is teaming with manufacturer Vertical Lax Inc. on the products.

(Emphasis added).

**Neal Goldman's Violation of the Agreement, In Direct Competition with Warrior**

24.     Neal Goldman has unequivocally breached his Agreement with Warrior, by his promotion of lacrosse apparel, by assisting Under Armour to enter the lacrosse equipment market and by attempting to sell lacrosse apparel in direct competition with Warrior. He has also breached his agreement with Warrior by directly contacting and soliciting business from Warrior's customers, including, Dick's Sporting Goods and The Sports Authority, for the sale of lacrosse equipment and apparel, as more fully detailed below.

25.     In May, 2011, Greg Cattrano, Warrior's General Manager, along with Warrior employees Adam Werder, Tom Burns, Todd Eichelberger, Billy Binge and Jess Hanson saw Neal Goldman at the Dick's Sporting Goods headquarters, 345 Court Street, Coraopolis, Pennsylvania, hanging Under Armour lacrosse products, including heads and sticks, in one of the Dick's Sporting Goods conference rooms.  These products are and were directly competitive with Warrior lacrosse products.  Neal Goldman was setting up the room to meet with the equipment (hardgoods) buyer for Dick's Sporting Goods Lacrosse and Neal Goldman thereafter met with the  equipment (hardgoods) buyer for Dick's Sporting Goods Lacrosse.  Neal Goldman was present with and assisting another Under Armour employee, who also was promoting and selling Under Armour lacrosse equipment to Dick's Sporting Goods.  Dick's Sporting Goods was at the time of the Agreement, and in May, 2011, and continues to be, a Warrior customer for lacrosse equipment.  Neal Goldman's meeting with Dick's Sporting Goods was and is a violation of Agreement, including paragraphs 5 B. and C., specifically:

> **Violation of the Agreement, Para. 5(B)**: Neal Goldman on a date that    is within two (2) years after termination of his employment with Warrior, directly or indirectly, engaged in Business Activities (other than on behalf of BRINE or its Principals) by contacting Dick's Sporting Goods, by supplying lacrosse products, including lacrosse equipment and apparel, offering to supply such products,

providing related services, or offering to provide services heretofore supplied or provided to Dick's Sporting Goods with whom BRINE or its Principals has done any business;

**Violation of the Agreement, Para. 5(C)**: Neal Goldman on a date that is within two (2) years after termination of his employment with Warrior, directly or indirectly, assisted others, namely, the Under Armour employee present with him at Dick's Sporting Goods, in engaging in any of the Business Activities in the manner prohibited to Neal Goldman, namely, assisting that Under Armour employee to sell lacrosse products to Dick's Sporting Goods..

26.     In June, 2011, the lacrosse buyer for The Sports Authority further confirmed in a conversation with Greg Cattrano of Warrior, that Neal Goldman was designing special lacrosse stringing components for The Sports Authority, and related as well that Neal Goldman had spoken and met with The Sports Authority buyers to discuss the sale to The Sports Authority of Under Armour lacrosse equipment.  These products are and were directly competitive with Warrior lacrosse products.  The Sports Authority was, at the time of the Agreement, and in June, 2011, and continues to be, a Warrior customer for lacrosse equipment.  Neal Goldman's contact with The Sports Authority was and is a violation of Agreement, including paragraph 5 B, specifically:

**Violation of the Agreement, Para. 5(B)**: Neal Goldman on a date that    is within two (2) years after termination of his employment with Warrior, directly or indirectly, engaged in Business Activities (other than on behalf of BRINE or its Principals) by contacting The Sports Authority, by supplying lacrosse products, including lacrosse equipment and apparel, offering to supply such products, providing related services, or offering to provide services heretofore supplied or provided to The Sports Authority with whom BRINE or its Principals has done any business.

**I.**

**Breach of Contract**

27.     Warrior incorporates by reference the foregoing allegations as if fully restated herein.

28.     The Agreement constitutes a valid and binding contract between Warrior and

Goldman.

29.     Warrior has fully performed its obligations under the contract, including the

employment of Neal Goldman and the payment to him of salary, for which Neal Goldman's

entry into the Agreement was a condition precedent .

30.     Neal Goldman has breached the terms of the contract, including, but not limited

to, as more fully detailed above:

> **Violation of the Agreement, Para. 5(B)**: Neal Goldman on a date that    is within
> two (2) years after termination of his employment with Warrior, directly or
> indirectly, engaged in Business Activities (other than on behalf of BRINE or its
> Principals) by contacting Dick's Sporting Goods, by supplying lacrosse products,
> including lacrosse equipment and apparel, offering to supply such products,
> providing related services, or offering to provide services heretofore supplied or
> provided to Dick's Sporting Goods with whom BRINE or its Principals has done
> any business;

> **Violation of the Agreement, Para. 5(B)**: Neal Goldman on a date that    is within
> two (2) years after termination of his employment with Warrior, directly or
> indirectly, engaged in Business Activities (other than on behalf of BRINE or its
> Principals) by contacting The Sports Authority, by supplying lacrosse products,
> including lacrosse equipment and apparel, offering to supply such products,
> providing related services, or offering to provide services heretofore supplied or
> provided to The Sports Authority with whom BRINE or its Principals has done
> any business.

> **Violation of the Agreement, Para. 5(C)**: Neal Goldman on a date that is within
> two (2) years after termination of his employment with Warrior, directly or
> indirectly, assisted others, namely, the Under Armour employee present with him
> at Dick's Sporting Goods, in engaging in any of the Business Activities in the
> manner prohibited to Neal Goldman, namely, assisting that Under Armour
> employee to sell lacrosse products to Dick's Sporting Goods..

31.     As a result of Neal Goldman's breach of contract, Warrior has suffered monetary

damages, specifically, the loss of sales and damage to its good will, and is entitled to its

attorneys fees and costs as the parties' contract provides, in the amount demanded *infra*..

**Count II**

**Injunctive Relief**

32.     Warrior incorporates by reference the foregoing allegations as if fully restated

herein.

33.     Neal Goldman's conduct, as described herein, has resulted in substantial harm to

Warrior and is anticipated to lead to future harm to Warrior.  As Senior Product Manager for

Apparel, by information and belief, Neal Goldman's responsibility expressly includes, at least,

the continued promotion of Under Armour lacrosse apparel, including promotion of Under

Armour lacrosse equipment, all in competition with Warrior and in violation of the Agreement,

specifically, Agreement paras. 5(B) and 5( C) as detailed above.

34.     Warrior is likely to succeed on the merits of the claims contained herein.

35.     Warrior will suffer immediately substantial and irreparable injury to its

competitive position if Neal Goldman is not enjoined from continuing to violate the Agreement.

36.     Warrior will suffer immediate, substantial and irreparable injury if Neal Goldman,

with his knowledge of Warrior's customers and design of Warrior's products, is not enjoined

from continuing to solicit Warrior's customers in direct violation of his Agreement with Warrior.

The two year time period during which Neal Goldman was prohibited from soliciting Warrior's

customers should be tolled during the period of Goldman's flagrant violation of such non-

solicitation covenant.

37.     The harm to Warrior substantially outweighs the harm to Goldman if Goldman is

not enjoined from continuing to violate the Agreement.

38.     The public interest in competition and in enforcing contracts is best served by

enjoining Neal Goldman's unlawful conduct, as described herein, as the enforcement of a valid

contractual right.

WHEREFORE, Warrior respectfully requests that this Court award it the following

relief:

A.      In response to Count I, that this Court enter judgment for Warrior and against

Neal Goldman in the amount of at least $75,000 exclusive of interest and costs,

and attorneys fees as provided by contract;

B.      In response to Count II, that this Court enjoin Neal Goldman, including by issue

of preliminary and permanent injunctive relief, from in any way violating his

Agreement with Warrior; and

C.      That in response to both Counts, that this Court award Warrior other just and

proper relief.

Dated: October 17, 2011.

/s/ J. Stephen Simms_____
J. Stephen Simms (#4269)
John T. Ward (#1507)
Marios J. Monopolis (#29177)
Simms Showers LLP
20 South Charles Street
Suite 702
Baltimore, Maryland 21201
Telephone: 410-783-5795
Facsimile: 410-510-1789
jssimms@simmsshowers.com
jtward@simmsshowers.com
mjmonopolis@simmsshowers.com

Warrior Counsel

**OF COUNSEL:**

James E. Romzek
Anissa C. Hudy
Warner Norcross & Judd LLP
12900 Hall Road
Suite 440
Sterling Heights, Michigan 48313-1175
Telephone: 248-784-5199
Facsimile:   248-603-9730
Email   jromzek@wnj.com
Email   ahudy@wnj.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2011 I caused the foregoing First Amended Complaint

and accompanying copy pursuant to Local Rule 103.6 (c ) to be filed on the Court's CM/ECF

system for service on all record counsel.

/s/ J. Stephen Simms_____